| | | |
|---|---|---|
| Marlon Johnson (R-10133), | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 15 C 7635 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| Daniel Sullivan, | ) | |
| | ) | |
| Respondent. | ) | |

# MEMORANDUM OPINION AND ORDER

Petitioner Marlon Johnson, a prisoner at the Big Muddy River Correctional Center, filed this *pro se* 28 U.S.C. § 2254 petition for a writ of habeas corpus to challenge his 2005 convictions for aggravated kidnapping and aggravated criminal sexual assault from Kane County, Illinois. (Dkt. 1.) For the reasons set forth below, the Court denies the § 2254 petition and declines to issue a certificate of appealability.

## BACKGROUND[1]

At Petitioner's trial, M.G. (the complainant), through a Spanish-language interpreter, testified to the following. On December 17, 2003, she was returning home from her night shift at a factory. (Dkt. 17-2, pg. 30). At 6:15 a.m., she parked her car in a reserved outdoor spot in front of her apartment building in Aurora, Illinois. Her car had four doors and a gear shift between the driver and front passenger seat. (*Id.*) According to M.G., she opened her door about four inches, and before she was able to step out of the car, Petitioner grabbed the upper corner of the door,

---

[1] The background facts and procedural history of this case are taken from the Illinois appellate court's decision in *People v. Johnson*, No. 2-12-1227, 2014 IL App (2d) 121227-U (Ill. App. 2d Dist. 2014) (unpublished), which was the last reasoned decision addressing Petitioner's claims, and from the Illinois appellate cases to which that opinion refers. (Dkt. 17-8, pg. 14)) (citing *People v. Johnson*, No. 2–05–1269 (Ill. App. 2d Dist. 2007); *People v. Johnson*, 401 Ill.App.3d 685 (Ill. App. 2d Dist. 2010); *People v. Johnson*, 2012 IL App (2d) 111301–U (Ill. App. 2d Dist. 2012)). Section 2254's deferential review standard (discussed below) requires federal courts to give deference to the "the last reasoned opinion" by a state court. *Wilson v. Sellers*, 138 S. Ct. 1188, 1194 (2018).

opened it, and asked for a ride. (*Id.*) M.G. testified that she had seen Petitioner for about two weeks standing in front of the apartment building at approximately the same time each morning. (*Id.*) Petitioner usually said "hi" or "good morning," and M.G. usually replied. She denied otherwise knowing him or his name. (*Id.*)

M.G. testified that she refused Petitioner's request for a ride, telling him that she had to get home to her baby. (Dkt. 17-2, pg. 30.) According to M.G., Petitioner put a box-cutter knife to her neck, then pulled the knife away and jumped over her to the passenger seat. (*Id.* at 31.) M.G. testified that Petitioner held the knife at her waist and directed her to drive to a Jewel grocery store, where he commented that "it" or "he" was not there. (*Id.*)

Petitioner then directed M.G. to continue driving. (*Id.*) After five or ten minutes, they parked in the parking lot of a factory. (*Id.*) Petitioner asked for money and M.G.'s purse. She said she had neither. (*Id.*) M.G. testified that Petitioner began looking through the car: lowering the sun visors and searching the glove compartment, center console area, and back seat. (*Id.*) After finding no money, Petitioner told M.G. to continue driving. (*Id.*) They drove to another parking lot on the same street where they again parked. M.G. testified that Petitioner took from his pocket photographs of naked women. (*Id.*) Petitioner allegedly told M.G. to look at the photos as he began taking off his pants. M.G. started to unbuckle her seatbelt, but Petitioner held the knife to her waist and directed her to refasten her seatbelt, which she did. (*Id.*) M.G. testified that Petitioner then placed the knife at her throat, pushed her head down, and forced her to perform oral sex. (*Id.* at 32.) Petitioner ejaculated. M.G. lifted her head and spat. (*Id.*) Petitioner then emptied a paper bag and used it to wipe his penis and anything on which he ejaculated. (*Id.*) M.G. testified that Petitioner had her drive back to the apartment building, where he exited the car, taking with him the paper bag and M.G.'s identification card. (*Id.*) Petitioner told M.G. that he was going to let her

go. (*Id.*) Petitioner also warned M.G. that he knew where she lived and that, if she went to the police, something worse would happen to her. (*Id.*)

Petitioner testified that, in December of 2003, he was a cocaine dealer living with his girlfriend and two children in an apartment complex near M.G.'s. (Dkt. 17-2, pg. 36.) He stated that he had met M.G. eight times before December 17, 2003. (*Id.*) Petitioner said he had met M.G. for first time in October 2003, when she bought drugs from Petitioner's friend. (*Id.*) At that time, Petitioner gave M.G. his phone number, and she later purchased drugs from him about six times. Petitioner stated that she said her name was Mimi when they first met. (*Id.*)

Petitioner testified that, on December 16, 2003, he was at a friend's apartment in an apartment complex next to M.G.'s. (Dkt. 17-2, pg. 37.) The men were playing video games and drinking. (*Id.*) Petitioner fell asleep and awoke the next morning around 6 a.m., when he immediately headed home. (*Id.*) Petitioner stated at trial that M.G. pulled up next to or near Petitioner, waved him over to her car, and asked if he would "front" her drugs until she was paid. (*Id.*) Petitioner testified that he usually did not front drugs for customers and, instead, offered to give her drugs in exchange for oral sex. M.G. agreed and parked her car. (*Id.*) According to Petitioner, the two went to a laundry room in his apartment building, where he sat on a washing machine while she performed oral sex. Petitioner testified that M.G. went to the sink to spit while he was still climaxing, which is how her clothes became stained with his semen. (*Id.*) Petitioner then told M.G. that he would return with a $50 bag of cocaine. He instead, however, went back to his friend's apartment because he did not want to confront his girlfriend at that time. (*Id.*) According to Petitioner's trial testimony, he never got in M.G.'s car, never held a knife to her, and never forced her to engage in oral sex. (*Id.* at 38.)

During closing statements, Petitioner's attorney argued that no physical evidence linked Petitioner to M.G.'s car: "Fingerprints. You didn't hear anything about fingerprints. Hairs. Nothing about hairs. This man handled these containers in the lunch box. No fingerprints, nothing." (Dkt. 17-12, pg. 80.) During deliberations, the jury sent a note to the trial judge asking: "Can we take into account the car was impounded and fingerprint[s] were not found?" (*Id.* at 105.) The judge informed the jury: "You have before you the admissible evidence." (*Id.*)

The jury found Petitioner guilty of both aggravated kidnapping and aggravated sexual assault. He received consecutive sentences of 8.5 years of imprisonment for kidnapping and ten years for the sexual assault. (Dkt. 17-2, pg. 38.)

In a *pro se* post-trial motion, Petitioner raised for the first time the question of whether fingerprint comparison testing had been performed. (Dkt. 17-13, pg. 9-14.) The prosecutor stated: "There were fingerprints obtained in the car, and when I contacted the lab for analysis, . . . they said once there's DNA, they don't really do fingerprints. It kind of stops. There is nothing conclusive about any of the fingerprints, and it was not really an issue." (*Id.* at 10.) Petitioner's trial attorney (Ronald Dolak) stated: "as far as the discovery I had, there was no [fingerprint] comparison, and we argued the fact that the State omitted it, that there wasn't any evidence against Marlon Johnson. I believe we argued that in our closing arguments, and I think that's how we addressed it." (*Id.* at 11.) The trial court denied Petitioner's post-trial motion.

The court concluded that counsel's "decisions . . . could well be considered trial strategy, although that evidence wasn't even available, and quite frankly, it appears that Mr. Dolak was able to get the most mileage out of it anyway by argument with pointing out the fact that that evidence was not presented." (*Id.* at 12-13.)

Contrary to the prosecutor's and Petitioner's trial attorney's statements at the post-trial hearing, fingerprint comparisons had been done and two reports issued. According to an Aurora Police Evidence Technician's Report, M.G.'s car was taken to a police garage around 6:00 p.m. on December 17, 2003. (Dkt. 17-6, pg. 30.) Two fingerprints were lifted from the exterior of the driver's door, and three prints were lifted from the exterior of the passenger's door. (*Id.*) The technician was "unable to recover any latent prints from inside the vehicle" or from a plastic container found in the car. (*Id.*) On July 28, 2004, Illinois State Police Forensics Scientist Barbara Wilkins reported that the five latent prints from M.G.'s car were compared to inked prints from M.G., Adan Oliverio, and Olga Travezoe.[2] Those comparisons "did not reveal any identifications." (*Id.* at 32.) Another analysis from April 14, 2005 compared the five prints from M.G.'s car to eleven inked prints from Petitioner. "Comparison of the suitable latent prints to the inked standards of Marlon Johnson did not reveal any identifications." (*Id.* at 37.)

Petitioner appealed. The fingerprint evidence issue was not raised on direct appeal. (Dkt. 17-1.)[3] His petition for leave to appeal (PLA) to the Illinois Supreme Court (which petition was denied) also did not address the fingerprint evidence. (Dkt. 17-3, 17-4).

While his direct appeal was pending, Petitioner, proceeding *pro se*, filed a petition for post-conviction relief in the state trial court. He argued that trial counsel was ineffective: (1) for failing

---

[2] Adan Oliverio was M.G.'s boyfriend and the father of her child. They were living together in December 2003. (Dkt. 19, pg. 25; Dkt. 17-9, pg. 53.) The record does not identify who Olga Travezoe is. The state appellate court stated that Oliverio and Travezoe were "two . . . people who had access to [M.G.'s] car," and "had been in the car." (Dkt. 17-8, pg. 14, 16.) In a document attached to Petitioner's habeas corpus petition (a response to an Attorney Registration and Disciplinary Commission (ARDC) investigation of the prosecutor's handling of the fingerprint evidence), Oliverio and Travezoe are described as "family/acquaintances of the victim." (Dkt .1, pg. 51.)

[3] On direct appeal, Petitioner, through counsel, argued: (1) the evidence was insufficient to prove his guilt (addressing inconsistencies with M.G.'s trial testimony and her statements to an investigating officer shortly after the incident); (2) the trial court impermissibly denied defense counsel's request to ask prospective jurors about their understanding of the presumption of innocence; (3) though a trial court's pretrial order forbade mention of a DNA sex registry database, the prosecutor elicited testimony about the database; and (4) the trial court erred in limiting defense counsel's questioning of an officer who, though not qualified as an expert, testified about the typical reactions of sexual assault victims. (*See* Dkt. 17-1, Petitioner's brief on direct appeal).

[5]

to introduce evidence that five fingerprints retrieved from M.G.'s car did not match Petitioner's fingerprints; and (2) for failing to interview the interpreter (who translated M.G.'s first account of the incident from Spanish to English) in an attempt to establish discrepancies between M.G.'s testimony and the officer's report. (Dkt. 17-4, pg. 2.)

The trial court, noting that a post-conviction petition can proceed while a direct appeal is pending, appointed counsel for Petitioner. (Dkt. 17-5, p.1.) That attorney, stating the petition lacked merit, asked to withdraw, which the trial court granted. (*Id.* at 2, 6.) Eight months later, the trial court granted the State's motion to dismiss the petition. (*Id.* at 7.)

With different counsel, Petitioner appealed. (Dkt. 17-5, pg. 8-75.) The state appellate court concluded that Petitioner's ineffective assistance claims had potential merit and that post-conviction counsel should not have been allowed to withdraw. (Dkt. 17-6, pg. 21-22.) The court reversed the dismissal of the post-conviction petition and remanded for further proceedings. (*Id.*)

On remand, Petitioner's re-appointed attorney filed an amended post-conviction petition. (Dkt. 17-6, pg. 23.) The amended petition argued: (1) trial counsel was ineffective for: (a) failing to call the forensic expert who conducted the fingerprint comparisons, and (b) failing to interview the person who translated M.G.'s initial account of the incident; (2) appellate counsel was ineffective for failing to raise ineffective assistance of trial counsel on appeal; and (3) a *Brady* violation occurred when the prosecutor falsely stated to the trial court and Petitioner's trial attorney that, while fingerprints were taken from the car, no comparison analysis was conducted. (Dkt. 17-6, pg. 27-29; Dkt. 17-7, pg. 1-2.) The trial court granted the State's motion to dismiss Petitioner's amended post-conviction petition. (Dkt. 17-7, p.3.)

Petitioner appealed, asserting one issue for review: "that trial counsel was ineffective for failing to obtain and present to the jury evidence that five fingerprints suitable for comparison were

found on the complainant's car and that none of the prints matched the defendant's, who maintained that he had never been in the car." (Dkt. 17-7, pg. 8.) The state appellate court affirmed the dismissal of Petitioner's amended post-conviction petition. (Dkt. 17-8, pg. 14-17.) The court determined that, though Petitioner could establish that his trial attorney's performance was deficient, he could not establish that he was prejudiced. (*Id.* at 16-17.) Observing that the five fingerprints recovered from M.G.'s car matched none of the samples taken (including those from M.G. and two other people who had been in M.G.'s car), the state court concluded that the fingerprint evidence was not very strong. (*Id.*) According to the state appellate court, Petitioner's trial counsel's closing statement (that the State introduced no fingerprint evidence when it should have) was "more persuasive" than the fingerprint evidence itself. (*Id.* at 17.)

Petitioner sought leave to appeal from the Illinois Supreme Court, again asserting his claim that trial counsel's failure to present the fingerprint evidence constituted ineffective assistance of trial counsel and that the appellate court's determination of no prejudice was incorrect. (Dkt. 17-8, pg. 19.) The Illinois Supreme Court, without explanation, denied the petition for leave to amend. (Dkt. 17-9, pg.1.)

## DISCUSSION

Petitioner's 28 U.S.C. § 2254 petition asserts three claims: (1) the prosecutor violated *Brady v. Maryland*, 373 U.S. 83 (1963) when she told the trial court and Petitioner's attorney at the post-trial hearing that, though fingerprints were collected from M.G.'s car, the lab stopped doing comparison analysis once it learned DNA evidence existed; (2) the prosecutor and Petitioner's first two defense attorneys (Brenda Willett and David Kliment), who had the fingerprint reports in Petitioner's discovery materials, conspired to keep the reports from Petitioner by not providing them to Ronald Dolak, his trial attorney; and (3) Attorney Dolak was ineffective

for not knowing about the fingerprint evidence despite several references to it in the case file and for not introducing the evidence at trial. (Dkt. 1, pg. 7-35 (issues listed on p. 35)).

Respondent argues claims one and two, because they were not presented to both the Illinois appellate and supreme courts, are procedurally defaulted. As to claim three (the ineffective-assistance claim), Respondent argues it is without merit. This Court begins its analysis with the ineffective assistance claim, which Respondent acknowledges was exhausted and is properly before the Court.

*Claim Three: Ineffective Assistance of Counsel*

Petitioner states that two fingerprint-comparison reports were prepared by a police forensics expert, that one of those reports found no match between Petitioner's eleven inked fingerprint samples and the five latent fingerprints taken from M.G.'s car, and that both reports were sent to Petitioner's first defense attorney Brenda Willet. (Dkt. 1, pg. 32.) Attorney Willet turned Petitioner's case over to Assistant Public Defender David Kliment, who later withdrew because of a conflict of interest. Petitioner's trial attorney, Dolak, received the case from Kliment. (*Id.*) The fingerprint evidence either was lost in the several transfers of the case file or was simply overlooked by Dolak, who stated at the posttrial hearing that he believed "there was no [fingerprint] comparison." (Dkt. 17-13, pg. 11.)

According to Petitioner, even if the fingerprint reports were not in the file given to Dolak, references to the evidence existed elsewhere in the record (in two motions to compel, in a response to discovery, and in testimony at grand jury proceedings), such that Dolak should have inquired about the reports. (Dkt. 1, 32-33.) Petitioner asserts that Dolak's lack of knowledge about the fingerprint evidence and failure to introduce it at trial constituted deficient performance, particularly because the defense was that Petitioner was never in M.G.'s car. (*Id.* at 33-34.)

Petitioner further contends that he was "severely prejudiced by counsel's failure to obtain [and present] the fingerprint evidence" (*Id.* at 34), particularly in light of his defense strategy and the jury's question as to whether it could consider the lack of fingerprint evidence.

To succeed on a Sixth Amendment claim of ineffective assistance of counsel, Petitioner must establish both: (1) deficient performance by counsel, i.e., "counsel's representation fell below an objective standard of reasonableness," and (2) prejudice to Petitioner as a result, i.e., "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Carter v. Duncan*, 819 F.3d 931, 941 (7th Cir. 2016) (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984)).

As discussed above, the Illinois appellate court addressed Petitioner's ineffective-assistance claim and determined that counsel's failure to discover the fingerprint evidence and present it at trial constituted deficient performance. (Dkt. 17-8, p. 15-17.) More specifically, the state appellate court observed that Petitioner's trial attorney, because he was unaware of the evidence, "failed to call as a witness the forensic scientist who conducted the fingerprint comparison test, present the report to the jury, or otherwise present evidence concerning the lack of fingerprint evidence." (*Id.* at 16.) The court determined that "[c]ounsel's failure to discover and present the evidence was deficient, as 'it cannot be seriously contended that defendant's attorney[ ] made a reasonable strategic decision not to present evidence of which [he was] unaware.'" (*Id.* at 16) (cite omitted).

The state appellate court, however, concluded that Petitioner was not prejudiced. The court explained that the fingerprint evidence—which showed no matches between the fingerprints recovered from M.G.'s car and the sample prints collected not only from Petitioner but also from M.G. and two others—was not "particularly powerful." (*Id.* at 17) The court went on to explain

that trial counsel's closing argument as to the absence of fingerprint evidence was more persuasive than the fingerprint evidence itself, such that trial counsel's failure to introduce the evidence did not prejudice Petitioner. (*Id.* at 17.)

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), this Court's consideration of Petitioner's claim is based upon a review of the decision of the state appellate court, as that is "the last reasoned opinion on the claim." *Woolley v. Rednour*, 702 F.3d 411, 421 (7th Cir. 2012) (quoting *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)). This Court cannot grant habeas corpus relief for a claim adjudicated on the merits by a state court, unless its adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[A] state-court decision is contrary to [Supreme] Court[] precedent if the state court arrives at a conclusion opposite to that reached by th[e Supreme] Court on a question of law" or "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [it]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). For a state court's application of federal law to be unreasonable, it must be "more than incorrect; it must have been objectively unreasonable." *Felton v. Bartow*, 926 F.3d 451, 464 (7th Cir. 2019) (citing *Wiggins v. Smith*, 539 U.S. 510, 520 (2003); *Williams*, 529 U.S. at 411). "'Unreasonable' in [the AEDPA] context . . . means something . . . lying well outside the boundaries of permissible differences of opinion." *McGhee v. Dittmann*, 794 F.3d 761, 769 (7th Cir. 2015) (quoting *Corcoran v. Neal*, 783 F.3d 676, 683 (7th Cir. 2015)). As long as this Court is "satisfied that the

[state appellate court] took the constitutional standard seriously and produce[d] an answer within the range of defensible positions, [it will] deny the writ." *Felton*, 926 F.3d at 464 (quoting *Taylor v. Bradley*, 448 F.3d 942, 948 (7th Cir. 2006)).

Here, the state appellate court's determination that Petitioner was not prejudiced by his attorney's failure to present the fingerprint evidence at trial was not contrary to or an unreasonable application of established Supreme Court law; nor was it an unreasonable determination of the facts in light of the evidence. *See* § 2254(d).[4]

The state appellate court correctly stated the standard for demonstrating prejudice for an ineffective assistance claim. "A defendant establishes prejudice by showing that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Dkt 17-8, pg. 16) (quoting *Strickland*, 466 U.S. at 694). Furthermore, the state appellate court's determination of the facts and its application of *Strickland*'s prejudice standard to those facts was reasonable.

The state appellate court observed that, according to the forensic scientist's reports, the latent fingerprints collected from M.G.'s car matched none of the inked samples collected from Petitioner, M.G., or two other people who had been in the car. (Dkt. 17-8, pg. 16-17.) Further addressing the limited probative value of fingerprint evidence, the state court compared Petitioner's claim to a similar claim in a prior Illinois case where fingerprint evidence was not introduced at trial. (*Id.*) (citing *People v. Peeples*, 793 N.E.2d 641, 673 (Ill. 2002)).

---

[4] Although courts often address ineffective assistance of counsel claims sequentially—first considering the deficient performance element and then prejudice—"a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697 ("there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in [a certain] order or even to address both components of the inquiry if the defendant makes an insufficient showing on one").

[11]

In *Peeples*, fingerprints recovered from the murder victim's apartment matched neither the victim, the defendant, nor others known to have been in the apartment. The state appellate court in Petitioner's case relied on the following analysis from *Peeples*:

> The absence of defendant's fingerprints from the victim's apartment does not, as defendant contends, necessarily constitute 'exculpatory' evidence which 'exonerates' him from the crimes. Contrary to the argument advanced by defendant, the lack of his fingerprints at the crime scene does not establish that defendant was not in the apartment; instead, it may indicate that he either was careful not to leave fingerprints or that any fingerprints that were left were unsuitable for comparison. In addition, the recovery of latent prints from the victim's apartment which did not match the victim, Killeen, Evenson or defendant does not lead to the conclusion advocated by defendant that the prints were those of the 'actual offender.' To the contrary, the jury could have attributed many innocent explanations to the recovery of the fingerprints, including that they were left by visitors who had been invited into the apartment.

(Dkt. 17-8, pg. 16) (citing *Peeples*, 793 N.E.2d at 675-76).

The state appellate court in Petitioner's case similarly concluded that his fingerprint evidence was not particularly strong.

> The possible reasons for the latent prints not matching defendant's prints were many, with most having nothing to do with whether defendant was actually in M.G.'s car. That is, as in *Peeples*, the fact that defendant's prints were not found in M.G.'s car could be attributable to the fact that defendant did not leave any fingerprints that were suitable for comparison. . . . In our view, this position is strengthened by the fact that the latent prints also did not match three other people who had been in the car, including M.G. herself.

(Dkt. 17-8, pg. 16) (citing *Peeples*, 793 N.E.2d at 675-76). Given the lack of a match between the prints recovered from M.G.'s car and any of the prints collected from M.G. and two other people who had access to M.G.'s car, the state court's determination that the fingerprint evidence "was not particularly powerful" was reasonable.

The weakness of the fingerprint evidence is further demonstrated by the fact that the evidence technician who collected fingerprints from the exterior of M.G.'s car "was unable to recover any latent prints inside of the vehicle" or from "the container sitting between the seats."

(Dkt. 17-6, pg. 30.) The evidence technician's report, if introduced with the two fingerprint-comparison reports, would have informed the jury that attempts were made to obtain prints from inside the car but that such attempts failed.

Given the weakness of the fingerprint evidence, the state appellate court was not unreasonable when it determined that Petitioner fared better from his attorney's closing argument as to the absence of fingerprint evidence than he would have with the introduction of the fingerprint evidence. Trial counsel argued during his closing statement that, despite M.G.'s testimony that Petitioner touched items inside her car, the State presented no fingerprint evidence. (Dkt. 17-12, pg. 80.) The state appellate court acknowledged Petitioner's contention that a broad argument about the lack of fingerprints cannot compare to the introduction of evidence demonstrating no match to Petitioner. The court reasoned, however, "that arguing broadly, as counsel did here, versus pinpointing that none of the five fingerprints found matched defendant, only benefited defendant," as opposed to benefiting no one due to the lack of any fingerprint matches. *Id.* "Because none of the five prints matched even M.G., . . . Counsel's argument that the State presented no fingerprint evidence, when the circumstances suggested that the State should have done so, was more persuasive." *Id.*

The state appellate court's conclusion was not unreasonable. Had the jury heard testimony that fingerprints from M.G.'s car matched prints from none of the individuals sampled, the jury would have been able to discount the fingerprint evidence. Had evidence of the failure to recover fingerprints from inside the car been introduced, the jury would have had an explanation about the lack of fingerprint evidence. Trial counsel's closing statement, however, allowed the jury to ponder the absence of fingerprint evidence. Those comments apparently resonated with the jury, which asked during deliberations: "Can we take into account the car was impounded and fingerprint[s]

[13]

were not found?" (Dkt. 17-12, pg. 105.) Counsel's request for the jury to consider the absence of fingerprint evidence was likely more persuasive than the evidence itself.

Petitioner's contention that he was prejudiced by not allowing the jury to hear "that 5 fingerprints were in fact found on the victim's car, yet none of those prints matched the Petitioner" asks this Court to consider only part of the fingerprint evidence. (Dkt. 1, pg. 33-4.) Courts, however, must "consider[] 'all the evidence—the good and the bad—when evaluating prejudice.'" *Trevino v. Davis*, 138 S. Ct. 1793, 1798 (2018) (quoting *Wong v. Belmontes*, 558 U.S. 15, 26 (2009)); *see also Carter v. Duncan*, 819 F.3d 931, 945 (7th Cir. 2016). Petitioner has not shown that, had the jury heard *all* the fingerprint evidence, "a reasonable probability [exists] that . . . the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

The state appellate court's determination that Petitioner cannot establish the prejudice element of his ineffective assistance claim was neither an unreasonable application of Supreme Court law nor an unreasonable determination of the facts in light of the evidence. Because Petitioner cannot succeed on the prejudice prong of his ineffective assistance of counsel claim, the claim fails; and this Court need not address the deficient performance prong. *Strickland*, 466 U.S. at 697 (a court need not "address both components of the inquiry if the defendant makes an insufficient showing on one"). Petitioner's claim that his Sixth Amendment right to effective assistance of counsel was violated is denied.

*Claims One and Two, Petitioner's Unexhausted Claims*

In addition to ineffective assistance of counsel, Petitioner also argues: (claim one) ASA Monaco violated *Brady v. Maryland*, 373 U.S. 83 (1963), when she falsely told the trial court and Petitioner's trial attorney (Dolak) that the state laboratory stopped doing fingerprint analysis once it learned of the existence of DNA evidence, and (claim two) Petitioner's first two defense

attorneys (Willett and Kliment) assisted with suppressing the exculpatory and material fingerprint evidence by not turning over all discovery to Dolak. (Dkt. 1, pg. 7-31.)

State prisoners seeking habeas corpus relief in federal court must "exhaust[ ] the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). They "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Snow v. Pfister*, 880 F.3d 857, 864 (7th Cir. 2018) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). A claim is unexhausted if it is not fairly presented to both an Illinois appellate court and the Illinois Supreme Court. *See Boerckel*, 526 U.S. at 848; *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007).

Respondent correctly argues, and Petitioner does not dispute, that neither claim was presented in one full round of state court review. Neither Petitioner's appellate brief nor his petition for leave to appeal (PLA) to the state supreme court on direct review presented these claims. (Dkt. 17-1; Dkt. 17-3.) Nor did Petitioner present these claims in his PLA to the state supreme court in his post-conviction proceedings. (Dkt. 17-8, pg. 18-86.) This Court notes that Petitioner's second appellate brief in his post-conviction case, like the PLA that followed, addressed only the ineffective assistance of counsel claim. (Dkt. 17-7, pg. 4-100.) Petitioner's first appellate brief on post-conviction review, which appealed the trial court's grant of appointed counsel's motion to withdraw, however, argued several possible constitutional violations relating to the fingerprint evidence, including "denial of due process, denial of fair trial, deprivation of the right to obtain and confront witnesses." (Dkt. 17-5, pg. 34.) Whether such language sufficed to present the state appellate court with claims of a *Brady* violation and conspiracy to commit a *Brady* violation is unclear. This Court need not decide if these claims were fairly presented to the state appellate court, because they were never presented to the state supreme court in Petitioner's PLAs. Claims

one and two are unexhausted, and because the time to present these claims to the state courts has passed, they are procedurally defaulted. *Guest*, 474 F.3d at 930 (citing *Boerckel*, 526 U.S. at 848).

Procedurally defaulted claims can be addressed in a § 2254 proceeding only "where the petitioner demonstrates either (1) 'cause for the default and actual prejudice' or (2) 'that failure to consider the claims will result in a fundamental miscarriage of justice.'" *Thomas v. Williams*, 822 F.3d 378, 386 (7th Cir. 2016) (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). Petitioner does not argue cause and prejudice to excuse his failure to exhaust. Instead, he asserts that a fundamental miscarriage of justice will result if this Court does not address these claims on the merits. (Dkt. 19.)

"The miscarriage-of-justice exception to procedural default requires the petitioner to make a convincing showing of actual innocence." *Jones v. Calloway*, 842 F.3d 454, 461 (7th Cir. 2016). "[T]he petitioner must have 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial,' . . . and must persuade the district court that it is 'more likely than not that no reasonable juror would have convicted him in light of the new evidence.'" *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 324, 327 (1995)). "'New evidence' in this context does not mean 'newly discovered evidence'; it just means evidence that was not presented at trial." *Id.* (quoting *Schlup*, 513 U.S. at 322, 324).

Petitioner points to two pieces of new evidence: (1) the fingerprint-comparison reports discussed above and (2) statements from M.G.'s former boyfriend that he was present when M.G. initially described the incident in Spanish to Officer Matthew Ziman and that Ziman's report accurately reflects M.G.'s statements. (Dkt. 19, pg. 5-6, 13.)

With respect to the fingerprint-comparison evidence, as addressed above, such evidence was not particularly powerful since the prints recovered from M.G.'s car matched prints from none

of the individuals from whom fingerprint samples were collected. The fundamental-miscarriage exception to procedural default does not require "new evidence" establishing an "absolute certainty" that Petitioner is innocent, but the evidence must demonstrate "that, more likely than not, no reasonable juror would find him guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 538 (2006). The purpose of this standard is to permit federal review of a procedurally defaulted claim "only in the 'extraordinary' case." *Id.* (quoting *Schlup*, 513 U.S. at 327). Given the inconclusiveness of the fingerprint evidence, it does not meet this standard.

Petitioner also points to evidence that M.G.'s boyfriend at the time of the incident, Adan Oliverio, who was present when she gave her initial statement to Police Officer Ziman, confirmed years later that Ziman's report accurately reflected M.G.'s description of the incident. (Dkt. 19, pg. 10-12.) At trial, much of Petitioner's defense was to discredit M.G.'s testimony, which was mainly done by showing inconsistencies between her trial testimony and her statements to Ziman on the day of the incident. Because Adan could have verified the accuracy of Ziman's report of M.G.'s statements, the jury, according to Petitioner, would not have been able to infer "that the inconsistencies were due to . . . miscommunication." (*Id.* at 12.) As new evidence, Petitioner cites a letter he received from his post-conviction attorney, who stated:

> Our investigator spoke to the 'husband' of the complainant who was present when the complainant told her version to Officer Ziman. . . . The man's name is Adan Oliverio and he told my investigator that the actual translation was done by his brother, Gustavo. The bottom line is that Mr. Oliverio stated to us that what appears in Officer Ziman's report is an accurate recording of what the complainant told the officer.

(Dkt. 19, pg. 25.)

Such evidence does not indicate that Petitioner is actually innocent. Instead, it adds minimal support to Petitioner's arguments at trial and on appeal that the inconsistencies between M.G.'s testimony and her statements to Ziman were not a result of a language barrier but instead

[17]

were evidence that M.G. lied. Evidence that Ziman's report accurately reflected M.G.'s statements on the day of the incident was presented to the jury. Ziman testified that, though he did not speak Spanish well, the report accurately described M.G.'s statements. (Dkt. 17-9, pg. 47-50.) Petitioner's trial attorney pointed out that several details in Ziman's report (such as that the sexual incident occurred on a dead-end street, that the person told her to drive to a Jewel and that the person went through her purse) had to have come M.G. (*Id.*) Furthermore, M.G. testified at trial that she told "the officer what [she] remembered happened." (Dkt. 17-10, pg. 4.)

Sufficient trial evidence existed for Petitioner to argue that M.G. said one thing to Officer Ziman on the day of the incident and another thing at trial. Petitioner's trial attorney was well able to argue that such inconsistencies meant that M.G.'s testimony should not be believed. The jury, however, believed her, despite the inconsistencies. Petitioner's new evidence—that M.G.'s ex-boyfriend years later confirmed that Ziman's report accurately reflected M.G.'s statements—does not add so much weight to Petitioner's argument about M.G.'s lack of credibility to persuade the Court that, more likely than not, no reasonable jury would have convicted. Petitioner's new evidence does not satisfy the fundamental miscarriage of justice exception. *See Rozzelle v. Sec'y, Fla. Dep't of Corr.*, 672 F.3d 1000, 1017 (11th Cir. 2012) (where the new evidence "is largely cumulative of what the jury heard," the fundamental miscarriage of justice exception is not met); *Guy v. Butler*, No. 14 C 08581, 2015 WL 6165147, at *7 (N.D. Ill. Oct. 19, 2015) (new evidence that "is purely cumulative . . . cannot establish a fundamental miscarriage of justice").

Petitioner has not demonstrated an exception to procedural default to allow a merits review of his unexhausted claims.

For the reasons stated above, Petitioner's ineffective assistance of counsel claim is denied on the merits. His claims of a *Brady* violation by the prosecutor and a similar violation by

Petitioner's first two defense attorneys are denied as procedurally defaulted. The court denies Petitioner's § 2254 petition.

*Certificate of Appealability and Notice of Appeal Rights*

The Court declines to issue a certificate of appealability. Petitioner cannot make a substantial showing of the denial of a constitutional right or that reasonable jurists would debate much less disagree with this Court's resolution of Petitioner's claims. *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

Petitioner is advised that this is a final decision ending his case in this Court. If Petitioner wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1).

## CONCLUSION

Petitioner's habeas corpus petition [1] is denied. Any pending motions are denied as moot. The Court declines to issue a certificate of appealability. The Clerk is instructed to: (1) enter a judgment in favor of Respondent and against Petitioner; (2) terminate Respondent Lashbrook from the docket; (3) update Petitioner's address to reflect that he is incarcerated at the Big Muddy River Correctional Center; (4) add Daniel Q. Sullivan, Warden, Big Muddy River Correctional Center as Respondent; and, (5) alter the case caption to *Johnson v. Sullivan*. Civil case terminated.

**SO ORDERED.**  ENTERED: **November 6, 2019**

_____
**HON. JORGE ALONSO**
**United States District Judge**